Akasa Holdings, LLC v 214 Lafayette House, LLC (2019 NY Slip Op 06447)





Akasa Holdings, LLC v 214 Lafayette House, LLC


2019 NY Slip Op 06447


Decided on September 3, 2019


Appellate Division, First Department


Friedman, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 3, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Dianne T. Renwick
Barbara R. Kapnick
Marcy L. Kahn
Jeffrey K. Oing,JJ.


155738/16 9279 

[*1]Akasa Holdings, LLC, Plaintiff-Appellant,
v
214 Lafayette House, LLC, Defendant-Respondent.



Plaintiff appeals from the order of the Supreme Court, New York County (Kathryn Freed, J.), entered March 14, 2018, which granted defendant's motion for summary judgment dismissing the complaint.




Slarskey LLC, New York (David Slarskey and Evan Fried of counsel), for appellant.
Butler, Fitzgerald, Fiveson & McCarthy, P.C., New York (David K. Fiveson and Claudia G. Jaffe of counsel), for respondent.



FRIEDMAN, J.P.


A bona fide purchaser of real property — one who purchases land "in good faith and for a valuable consideration" (Real Property Law § 291) — takes the property free and clear of any prior conveyance, encumbrance or servitude of which the purchaser did not have actual or constructive notice at the time of the purchase (see e.g. Witter v Taggart, 78 NY2d 234, 239 [1991]; Dale A. Whitman, Ann M. Burkhart, R. Wilson Freyermuth & Troy A. Rule, Property [hereinafter, Whitman] § 11.10, at 774 [4th ed 2019] [bona fide purchaser status "has two elements: paying value and taking in good faith with no notice of the prior conveyance"]). The question presented by this appeal is whether plaintiff, in purchasing a parcel of land in Manhattan, had constructive notice that the property (57 Crosby Street, a vacant lot) was burdened by a prior express easement that had been granted for the benefit of the parcel (214 Lafayette Street) diagonally to its rear. This question arises because, although the easement had been properly recorded and indexed upon its creation in 1981, the process of finding it through a title search at the time of plaintiff's purchase in 2011 was complicated by a change that had been [*2]made in 1984 to 57 Crosby's lot number on the Tax Map of the City of New York.[FN1]
In brief, at the beginning of the 1970s, 57 Crosby was designated as Lot 9 of Block 482. At some point after February 2, 1972, 57 Crosby was merged into Lot 30 of Block 482, along with a parcel next door to it and the aforementioned 214 Lafayette [FN2]. As noted, the easement was created in 1981, while 57 Crosby (the servient parcel) and 214 Lafayette (the dominant parcel) were both parts of Lot 30. About three years later, in 1984, Lot 30 was subdivided into three separate lots and 57 Crosby was redesignated as Lot 9, the same designation that had been used for it up until the merger into Lot 30. No document memorializing the subdivision of Lot 30 was indexed against Lot 9, nor was the easement reindexed against Lot 9 at the time of the subdivision. Accordingly, it is undisputed that, in 2011, a 40-year title search on ACRIS of 57 Crosby, under its designation as Lot 9, would have yielded (1) instruments recorded up until the parcel's merger into Lot 30 in the 1970s and (2) instruments recorded after the 1984 subdivision and redesignation of the parcel as Lot 9, but (3) no instruments (such as the declaration of the subject easement) that were recorded during the intervening period, when the parcel was part of Lot 30.
The question that emerges from the foregoing is whether, in 2011 (the year of plaintiff's purchase), a reasonably prudent prospective purchaser would have realized, after completing a search limited to documents indexed against Lot 9, that the results of that search did not provide a full picture of 57 Crosby's title status. The record establishes, as a matter of law, that the need for additional inquiry, not limited to instruments indexed against Lot 9, would have been obvious, given that (as more fully described below) a search limited to Lot 9 at that time would have shown an apparent gap in 57 Crosby's chain of title. Further, had elementary steps then been taken to extend the search beyond Lot 9, the subject easement readily would have come to light. Accordingly, we hold that plaintiff acquired 57 Crosby with constructive notice of the easement and lacks standing as a bona fide purchaser to void it.
Factual Background
We now turn to a more detailed account of this appeal's factual background. The setting of the dispute is a contiguous block of four rectangular properties, each about 100 feet long by 25 feet wide, between Crosby Street (to the west) and Lafayette Street (to the east) in Soho. Two of the properties front on Crosby Street (55 Crosby and 57 Crosby) and the other two front on Lafayette Street (214 Lafayette and 216 Lafayette). At this location (between Spring Street to the north and Broome Street to the south), Crosby and Lafayette are roughly parallel, north-south streets, with the street numbers ascending south to north. Thus, 57 Crosby is next door to, and directly to the north of, 55 Crosby; 216 Lafayette is next door to, and directly to the north of, 214 Lafayette; 57 Crosby and 216 Lafayette adjoin each other at the rear; and 55 Crosby and 214 Lafayette adjoin each other at the rear. The two parcels affected by the easement at issue — 57 Crosby (now owned by plaintiff) and 214 Lafayette (now owned by defendant) — are situated diagonally, or "catty corner" (the colloquial description used by one email in the record), to each other, 57 Crosby to the northwest and 214 Lafayette to the southeast.[FN3]
The 1970s: 57 Crosby, Previously Designated
As Lot 9, is Merged into Lot 30
As of July 1971, all four of the properties described above — 55 Crosby, 57 Crosby, 216 Lafayette, and 214 Lafayette — were owned by Aaron and Rosalyn (or Roslyn) Epstein, a married couple. The Epsteins had purchased 216 Lafayette (which at all relevant times has been designated Lot 28) in 1967 [FN4]. In July 1971, the Epsteins' purchase from Consolidated Edison (Con Ed) of the remaining three parcels was recorded. At that time, 55 Crosby and 214 Lafayette (which, to reiterate, adjoin each other back to back) were designated as Lot 30, and 57 Crosby was designated as Lot 9.
The record contains an ACRIS printout of the results of a search of documents indexed to Lot 9 (57 Crosby) indicating that, after the 1971 deed to the Epsteins, three additional instruments were indexed against Lot 9 in 1971 and 1972, the last of which was a release recorded on February 2, 1972. It is undisputed that, at some unknown point between February 1972 and August 1979, 57 Crosby was merged into Lot 30 (which already included 55 Crosby [*3]and 214 Lafayette). At that point, the Lot 9 designation fell into disuse.
1979: 57 Crosby is Conveyed to a
New Owner While Part of Lot 30
By deed dated July 12, 1979, the Epsteins conveyed all four contiguous properties (55 Crosby, 57 Crosby, 216 Lafayette and 214 Lafayette) to an entity known as Spacemakers Two. When that deed was recorded on August 7, 1979, it was indexed against Lot 28 (216 Lafayette) and Lot 30 (55 Crosby, 57 Crosby and 214 Lafayette). The 1979 deed was not indexed against Lot 9 because that designation was not in use for any parcel on Block 482 at that time.
1981: The Subject Easement is Created,
While 57 Crosby (the Servient Estate)
and 214 Lafayette (the Dominant Estate)
Are Both Parts of Lot 30
By deed dated July 1, 1981, Spacemakers Two, while retaining ownership of the other three parcels, conveyed 214 Lafayette (noted on the deed to be part of Lot 30) to an entity known as Artsbar Associates (Artsbar). By a declaration of the same date, Spacemakers Two, as owner of 216 Lafayette and 57 Crosby, granted Artsbar, as the new owner of 214 Lafayette, certain easements against 216 Lafayette and 57 Crosby. As against 216 Lafayette, 214 Lafayette was granted (1) an easement restricting the height of any building at 216 Lafayette to the height of the existing two-story building and (2) an easement "for emergency egress by foot over the roof" of the building at 216 Lafayette. As against 57 Crosby, 214 Lafayette was granted "a non-exclusive easement for ingress and egress by foot over a strip of land six feet wide contiguous to and north of the southerly border of . . . 57 Crosby Street," as shown on certain exhibits attached to the declarations (emphasis added)[FN5]. This easement against 57 Crosby (hereinafter, the 1981 easement) is at issue in this action. The 1981 easement provides that it runs with the land and will be binding "for so long as the present building on [214 Lafayette] remains standing."[FN6]
The deed conveying 214 Lafayette to Artsbar and the 1981 easement were both recorded on July 10, 1981. Because 57 Crosby and 214 Lafayette were both parts of Lot 30 in 1981, the 1981 easement was indexed against Lot 30 when the instrument was recorded. Again, in 1981, the designation "Lot 9" was not in use for any parcel on Block 482.
1983: 57 Crosby is Again Conveyed to
a New Owner While Part of Lot 30
Less than two years after the creation of the 1981 easement, 57 Crosby (the servient estate) was sold to a new owner. By deed dated March 1, 1983, and recorded May 2, 1983, Spacemakers Two conveyed 57 Crosby to an entity known as Parking Lot Partnership. When the deed to Parking Lot Partnership was recorded, it was indexed against Lot 30, of which 57 Crosby was a part in 1983. The deed of 57 Crosby to Parking Lot Partnership does not make note of the [*4]1981 easement.
Shortly after Parking Lot Partnership took title to 57 Crosby, Spacemakers Two sold 55 Crosby to 55 Crosby Associates, Inc. (55 Associates), a cooperative corporation. Thus, as of mid-1983, a different owner held title to each of the three parcels then encompassed by Lot 30: Parking Lot Partnership owned 57 Crosby; Artsbar owned 214 Lafayette; and 55 Associates owned 55 Crosby.
1984: 57 Crosby is Subdivided from
Lot 30 and Redesignated as Lot 9
In May 1984, the three owners of the three parcels encompassed by Lot 30 jointly filed an application to have Lot 30 subdivided into three separate lots. The owners proposed that, after the subdivision, 214 Lafayette retain the designation of Lot 30; 55 Crosby be designated Lot 8; and 57 Crosby be redesignated Lot 9 — the same lot number that had been assigned to 57 Crosby before its merger into Lot 30 during the previous decade. The subdivision was effected as proposed by the owners. Apparently by inadvertence, the documentation of the subdivision, upon being recorded, was indexed only against Lot 30 (now 214 Lafayette alone) but not against Lot 8 (55 Crosby) and — more significantly here — not against the revived Lot 9 (57 Crosby).
1999: 57 Crosby, as Lot 9, is Conveyed to
Plaintiff's Immediate Predecessor in Interest
Parking Lot Partnership owned 57 Crosby from 1983 until 1999. By deed dated April 28, 1999, and recorded May 24, 1999, Parking Lot Partnership conveyed 57 Crosby to Walter Chatham, plaintiff's immediate predecessor in interest. The deed of 57 Crosby to Chatham, which was indexed against Lot 9, does not make note of the 1981 easement.
At about the same time as he took title to 57 Crosby, Chatham granted the owner of 216 Lafayette — the parcel abutting 57 Crosby at the rear (i.e., to the east) — an easement "for ingress and egress by foot" over strips of land alongside 57 Crosby's northern and eastern borders (respectively, 6 feet wide and 12 feet wide)[FN7]. The easement granted to 216 Lafayette (hereinafter, the 1999 easement) was also indexed against Lot 9 upon being recorded.
2011: 57 Crosby, as Lot 9, is Conveyed to Plaintiff
By deed dated March 31, 2011, and recorded April 11, 2011, Chatham conveyed 57 Crosby to plaintiff Akasa Holdings, LLC. The deed to plaintiff, like the deed to Chatham, was indexed against Lot 9. Like the respective deeds to plaintiff's predecessors in interest (Parking Lot Partnership and Chatham), the deed of 57 Crosby to plaintiff does not make note of the 1981 easement.
Plaintiff purchased a title insurance policy to cover its purchase of 57 Crosby. The policy contains exclusions for, among other things, matters set forth in an attached survey reading of the parcel and the 1999 easement in favor of 216 Lafayette (which easement, to reiterate, had been indexed against Lot 9). The policy makes no reference to the 1981 easement (the one at issue here), which was not found in the title search conducted on behalf of the insurer.
At about the same time plaintiff purchased the vacant lot at 57 Crosby, it also purchased the residential cooperative apartment occupying the first two floors of the adjoining building at 55 Crosby. It appears from the record that, at some point before plaintiff's purchase, structures [*5]used for side access to the 55 Crosby building (two staircase platforms and an elevator lift) were built on the southern edge of the 57 Crosby lot, in the path of the 1981 easement.
2014: Defendant Indexes the 1981 Easement Against
Lot 9, and the Instant Dispute Begins
Defendant 214 Lafayette House LLC took title to 214 Lafayette in 2012 [FN8]. In August 2014, the Office of the City Register, at defendant's instance, indexed the 1981 easement against Lot 9 (57 Crosby) and Lot 28 (216 Lafayette), with the following notation, dated August 20, 2014:
"BLOCK AND LOT CORRECTION TO ADD LOTS 28 & 9 WHICH WERE INADVERTENTLY OMITTED AT THE TIME OF RECORDING."
In October 2014, defendant's attorney sent plaintiff's attorney an email, explaining that the 1981 easement, when originally recorded, had been "only indexed on the records of the 214 Lafayette Street parcel, although it affected the 216 Lafayette Street and 57 Crosby Street parcels." The email requested that plaintiff, as owner of 57 Crosby, sign a new declaration "acknowledg[ing], ratify[ing] and reconfirm[ing] all of the terms, covenants and conditions" of the 1981 easement. Plaintiff declined to sign the new declaration.
Prior Proceedings in This Action
In July 2016, plaintiff commenced this action to quiet title under article 15 of the RPAPL. In summary, the complaint alleges that plaintiff "purchased [57 Crosby] for value without any notice of the [1981 easement], which was absent from its chain of title until the recent recording on August 20, 2014." Based on this contention, the complaint seeks, as relevant to this appeal, a judgment declaring that plaintiff holds title to 57 Crosby "free from any easement or other interest of [d]efendant," and an injunction "permanently restraining and enjoining [d]efendant . . . from utilizing the [1981 easement]."[FN9] In its answer to the complaint, defendant asserts the following affirmative defense: "Plaintiff was on actual and constructive notice of defendant's prior easement, [and] is therefore not a bona fide purchaser for value and any [of its] rights in 57 Crosby are subject to defendant's easement."
In July 2017, defendant moved for summary judgment dismissing the complaint. Based on printouts of ACRIS title searches and the recorded instruments referenced above, defendant argued that plaintiff purchased 57 Crosby with notice of the 1981 easement because the easement had been properly recorded and, upon being recorded, had been properly indexed against Lot 30, which, in 1981, encompassed both 57 Crosby and 214 Lafayette. In this regard, defendant took the position that the 1981 easement was in plaintiff's direct chain of title to 57 Crosby because the easement was granted by Spacemakers Two, the common predecessor in interest of both plaintiff as owner of the servient estate (57 Crosby) and defendant as owner of the dominant estate (214 Lafayette). Defendant also argued that plaintiff was placed on inquiry notice of the [*6]1981 easement by the 1999 easement, an encumbrance on 57 Crosby of which plaintiff, by its own admission, had been aware when it purchased the lot.[FN10]
In opposition to the motion, plaintiff submitted the affidavit of David J. Carroll, the president of S.J. Carroll Jr. Inc., which, according to Carroll, is "a company engaged in property and title searches." Carroll opined, based on his "knowledge and experience founded upon my decades working in the title industry," that, "[a]s of March 31, 2011 (when [p]laintiff acquired Lot 9 [57 Crosby]), a title search of Lot 9 by an examiner employing industry standards would not have reflected that the [1981 easement] had been recorded against Lot 9." Carroll attributed this to the reuse, upon the subdivision of Lot 30 in 1984, of the same lot number (Lot 9) to designate 57 Crosby that had been used to designate the parcel before its merger into Lot 30 during the previous decade. Carroll elaborated as follows (paragraph numbers omitted):
"The reuse of a previously used lot number after subdivision, like the reuse of Lot 9 herein after the subdivision of the Original Lot 30, is a practice that is not appropriate, is avoided and is exceedingly rare for the very reason explained below. Title examiners conduct searches of the title history of properties in the City of New York using the . . . ACRIS database. We do so by searching properties based on the section, block and lot numbers of the properties.
"According to commonly accepted standards of the title search industry, a proper title search should date back for a period of 40 years. A search of ACRIS that is conducted by section, block and lot simply pulls up the history of tax lots in isolation and without information as to what may have been recorded against any other lot from which it derived. Thus, a search of Lot 9 only pulls up encumbrances actually indexed against or recorded against Lot 9, and a search of Lot 30 only pulls up encumbrances of Lot 30.
"The problem with reusing the same numbers for tax lot designations is highlighted by the record of this matter. For example, since Lot 9 (i.e. 57 Crosby Street) was the designation used for many years prior to [the parcel] becoming [*7]merged into the Original Lot 30 in 1971[[FN11]], and then was the same designation after the subdivision in 1984 when the Lot 9 designation was again reused as the tax lot designation, there would have been no indication to any examiner searching Lot 9 in 2011 (when [p]laintiff acquired Lot 9) that the [1981 easement] was recorded against Lot 9 (which it was not) based on a prior recording against the Original Lot 30 in 1981 prior to the subdivision.
"That is because Lot 9 had been used and reused as the designation for 57 Crosby (both before and after it was part of the Original Lot 30), and thus a search of Lot 9 in 2011 would have satisfied industry standards by allowing for a look back of more than 40 years, with no indication during that time of any recording of the [1981 easement] against Lot 9. The recording of the [1981 easement] . . . against Lot 30 would not have been revealed based on a proper title search of a 40 year history of Lot 9 using ACRIS.
". . . [F]or good reason, the City of New York does not normally reuse tax lot designations when subdivisions occur. Rather, an entirely new tax lot designation is, and should at all times be, used, such that a search by an examiner of a newly designated lot would (based on industry standards of 40 years) necessarily involve a search of the parcel from which that newly designated lot derived (this parcel is called the parent' parcel). That is, if for example, a subdivision of a lot designated as Lot 1 occurs in 2010, and produces new lots designated as Lots 2 and 3, a search of Lot 3 in 2017 would only reveal an existence of 7 years. In that case, the examiner would be required if following industry standards to search back more years and thus would turn up the parent' lot (i.e., Lot 1) and any encumbrances against that lot within 40 years.
"However, in a situation where, as here, the same lot number was reused, a search by an examiner of the ACRIS database would show a long-term independent existence and use of the tax lot number, and would not require searching any other parcel from which that lot may have derived" (emphasis added).
Carroll observed that the printout of the result of a post-2014 ACRIS title search of Lot 9, which defendant had submitted in support of its motion, confirmed that the 1981 easement had not been indexed against Lot 9 until 2014. While the declaration creating the 1981 easement appears on that printout, the reference to that document is accompanied by the aforementioned [*8]notation entered by the Office of the City Register, to the effect that a "CORRECTION" was made on August 20, 2014, "TO ADD LOTS 28 & 9 WHICH WERE INADVERTENTLY OMITTED AT THE TIME OF RECORDING."
In reply, defendant submitted the affidavit of Christopher M. Beck, the director of operations at Ridge Abstract Corp. According to Beck, Ridge Abstract is a licensed title insurance agent authorized to issue title insurance policies and certificates of title under Insurance Law §§ 2101-2102 and CPLR 4523. Beck identified himself as a sublicensee under Ridge Abstract's title insurance license.[FN12]
Beck agreed with Carroll that the industry standard dictates that a title search should extend 40 years into the past. Further, Beck did not take issue with Carroll's view that, upon the subdivision of Lot 30 in 1984, the previously used designation of Lot 9 should not have been reassigned to 57 Crosby. Nor did Beck disagree with Carroll that, in 2011, a 40-year title search limited to records indexed against Lot 9 would not have turned up the 1981 easement, which was then indexed only against Lot 30. Beck parted ways with Carroll, however, on the question of whether the results of a search limited to Lot 9 in 2011 would have indicated to a prudent person that the search needed to be extended beyond Lot 9 to obtain a complete picture of 57 Crosby's title status within a 40-year time frame.
According to Beck, "[T]o establish [that] good title existed in Walter Chatham, the party from whom [plaintiff] was considering purchasing 57 Crosby Street in March 2011, the title examiner/title reader would have had to examine ACRIS records for Block 482, Lot 30." This is because, in March 2011, a person conducting a 40-year search of records indexed to Block 482, Lot 9 (then 57 Crosby's designation) would have found an apparent gap in the chain of title leading to Chatham. Specifically, an examination of the records indexed to Lot 9 in March 2011 would have revealed only two deeds conveying title to 57 Crosby within the previous 40 years: (1) the 1999 deed by which Parking Lot Partnership conveyed the parcel to Chatham; and (2) the 1971 deed by which Con Ed conveyed the parcel (along with 55 Crosby and 214 Lafayette) to the Epsteins. As stated by Beck, "As of March 2011, ACRIS records for Lot 9 would not have shown how title came to be vested in Parking Lot Partnership [Chatham's grantor], i.e., who conveyed 57 Crosby Street to that entity and when."
Beck further explained that, to discover how Parking Lot Partnership obtained title to 57 Crosby, an examiner in March 2011
"would have had to conduct an ACRIS search for Parking Lot Partnership's vesting deed by conducting a grantee search under Parking Lot Partnership's [*9]name. That search would have discovered [that] Parking Lot Partnership obtained title . . . from Spacemakers Two pursuant to a deed dated March 1, 1983, which was recorded May 2, 1983 against Block 482, Lot 30" (emphasis added).[FN13]
At that point, Beck explained, the examiner should have (1) conducted a search of records indexed against Lot 30 going back to March 1971, (2) conducted a grantee search under the name of Spacemakers Two, and (3) conducted a search back up the chain of title from March 1971 to March 2011 to identify "any grants or conveyances made by those former owners" of 57 Crosby. Such inquiries would have revealed the 1979 deed from the Epsteins to Spacemakers Two. The discovery of the 1979 deed would have completed the chain of title to 57 Crosby from the Epsteins (grantees of Con Ed in 1971) to Spacemakers Two (grantee of the Epsteins in 1979) to Parking Lot Partnership (grantee of Spacemakers Two in 1983) to Chatham (grantee of Parking Lot Partnership in 1999), thereby eliminating the gap between the Epsteins and Parking Lot Partnership that would have appeared from an initial search limited to records indexed against Lot 9. Expanding the search in this manner also would have uncovered the 1981 easement granted by Spacemakers Two, the declaration of which had been recorded against Lot 30 when that lot number encompassed both 57 Crosby (the servient estate) and 214 Lafayette (the dominant estate).
Beck summarized his conclusions as follows:
"[A]n examination of the ACRIS records for Block 482, Lot 9, as of March 2011, would have revealed two breaks in the chain of title. Because of those breaks, the title examiner/title reader could not confirm [that] Mr. Chatham had good title solely by searching Block 482, Lot 9. A title examiner would have had to conduct a search by grantor/grantee's name to identify all conveyances leading to Mr. Chatham's acquisition of title. Thus, it would have been insufficient for a title examiner/title reader examining ACRIS records to look only at Block 482, Lot 9. The missing conveyance or conveyances would be found outside of the ACRIS records for Lot 9."[FN14]
The Decision Appealed From
Supreme Court granted defendant's motion for summary judgment dismissing the complaint. In the court's view, although the 1981 easement had been properly recorded and indexed upon its creation, a ministerial error was subsequently committed when the City Register "fail[ed] to include the Declaration [of the 1981 easement] in the Register's records for the newly created Lot 9 at the time of the subdivision [of Lot 30] in 1984." The court then framed the issue presented as whether "an instrument that is duly recorded and properly entered on the Register's records against the appropriate block and lot, at the time of recording, can be defeated by a ministerial error committed years later in the maintenance and updating of the Register's [*10]records." In answering this question, the court relied on a distinction drawn in the case of Baccari v De Santi (70 AD2d 198 [2d Dept 1979]) between clerical errors of misfeasance (such as indexing an instrument incorrectly) and clerical errors of nonfeasance (such as entirely failing to record or index an instrument). Based on its understanding that, under Baccari, only errors of misfeasance void the effect of the recording of an instrument, the court held that "[t]he nonfeasance of the Register, in failing to properly include the Declaration [of the 1981 easement] on its records in connection with the new Lot 9 at the time of the subdivision [of Lot 30 in 1984], constitutes a ministerial error that did not void the 1981 recording." Plaintiff now appeals from this determination.
Discussion
Like the motion court, we conclude that plaintiff purchased 57 Crosby with constructive notice of the 1981 easement and, therefore, lacks standing as a bona fide purchaser to void that encumbrance [FN15]. We reach this conclusion, however, based on reasoning somewhat different from that of the motion court, as more fully discussed below. Also, because the complaint seeks a declaratory judgment, rather than simply affirm the order appealed from, we modify that order to render a declaration in defendant's favor (see Lanza v Wagner, 11 NY2d 317, 334 [1962], cert denied 371 US 901 [1962]).
We begin by observing that defendant, in support of its summary judgment motion, established, prima facie, that, as owner of 214 Lafayette, it holds title to the 1981 easement. Specifically, defendant made out a prima facie case that the 1981 easement, as set forth in the declaration creating it, is an easement appurtenant to its parcel at 214 Lafayette.
"An easement appurtenant occurs when the easement (1) is conveyed in writing, (2) is subscribed by the creator, and (3) burdens the servient estate for the benefit of the dominant estate. The easement passes to subsequent owners of the dominant estate through appurtenance clauses, even if it is not specifically mentioned in the deed. Once created, the easement runs with the land and can only be extinguished by abandonment, conveyance, condemnation, or adverse possession" (Djoganopoulos v Polkes, 95 AD3d 933, 935 [2d Dept 2012] [citations omitted]; see also Will v Gates, 89 NY2d 778, 783 [1997] [an easement appurtenant "is inseparable from the land and a grant of the land carries with it the [*11]grant of the easement"]).[FN16]
Defendant also established — and plaintiff has not disputed — that the 1981 easement was properly recorded and indexed against Lot 30 — which then encompassed both the servient estate (57 Crosby) and the dominant estate (214 Lafayette) — upon its creation in 1981. The question presented, therefore, is whether plaintiff, when it purchased 57 Crosby in 2011, had constructive notice of the 1981 easement, notwithstanding that the indexing of the easement had not been changed by the City Register when 57 Crosby was subdivided from Lot 30 in 1984 and reassigned its previous designation of Lot 9.
At this point, it should be noted that the answer to the foregoing question does not turn on whether the 1981 easement would have been found in a search in 2011 of the direct chain of title to 57 Crosby. Almost 40 years ago, the Court of Appeals held that "the rule limiting constructive notice to recorded conveyances that are within the purchaser's direct chain of title" does not apply "to instances in which the purchaser had access to a block and lot' or tract indexing system," such as the one in use in New York City (Andy Associates, 49 NY2d at 24)[FN17]. Pursuant to the holding of Andy Associates, "[I]n counties using a block and lot' indexing system, a purchaser is charged with record notice of all matters indexed under the block and lot numbers corresponding to the purchaser's property, regardless of whether such information also appears in his or her direct chain of title" (Farrell v Sitaras, 22 AD3d 518, 520 [2d Dept 2005]). Thus, although (contrary to defendant's assertions) the 1981 easement was not recorded within plaintiff's direct chain of title, that circumstance has no bearing on the outcome of this appeal.[FN18]
The principle that is determinative of the resolution of this appeal is a familiar one:
"The intended purchaser [of real property] must be presumed to have investigated the title, and to have examined every deed or instrument properly recorded, and to have known every fact disclosed or to which an inquiry suggested by the record would have led. If the purchaser fails to use due diligence in examining the title, he or she is chargeable, as a matter of law, with notice of the facts which a proper inquiry would have disclosed" (Fairmont Funding v Stefansky, 301 AD2d 562, 564 [2d Dept 2003] [emphasis added, citations omitted]; see also Astoria Fed. Sav. & Loan Assn. v June, 190 AD2d 644, 645 [2d Dept 1993] [same]).
More than 120 years ago, the Court of Appeals expressed the same idea in the following words:
"If the facts within the knowledge of the purchaser are of such a nature, as, in reason, to put him upon inquiry, and to excite the suspicion of an ordinarily prudent person and he fails to make some investigation, he will be chargeable with that knowledge which a reasonable inquiry, as suggested by the facts, would have revealed" (Anderson v Blood, 152 NY 285, 293 [1897]).
This principle has been recognized in numerous decisions over the years (see e.g. 2386 Creston Ave. Realty, LLC v M-P-M Mgt. Corp., 58 AD3d 158, 163 [1st Dept 2008], lv denied 11 NY3d 716 [2009] ["the status of good faith purchaser for value cannot be maintained by a purchaser with either notice or knowledge of a prior interest or equity in the property, or one with knowledge of facts that would lead a reasonably prudent purchaser to make inquiries concerning such"] [emphasis added, internal quotation marks omitted]; accord Emigrant Bank v Drimmer, 171 AD3d 1132, 1134 [2d Dept 2019] [same]; Russell v Perrone, 301 AD2d 835, 836 [3d Dept 2003], amended on other grounds 1 AD3d 789 [3d Dept 2003] ["when a purchaser has knowledge of any fact sufficient to put him on inquiry as to the existence of some right or title in conflict with that which he is about to purchase, he is presumed to have made the inquiry and ascertained the extent of such prior right"] [internal quotation marks, brackets and ellipsis omitted]; Donald J. Kochan & James Charles Smith, When Inquiring Minds Ought To Know . . . , 31 Prob. & Prop. [No. 4] 57, 58 [July/Aug. 2017] ["When purchasers have reason to believe from the instruments, surrounding circumstances, or facts brought to their attention that more information may be found about the interest holders in property — that is, when the duty to inquire further is triggered — then they must reach out and start investigating," and such a [*12]purchaser "will be charged with actual knowledge of whatever facts she might have discovered if she had completed the mandated, diligent inquiry"]).
When the doctrine of inquiry notice is applied to the facts of this case, two questions emerge. First, would the results of a search for title records indexed against Lot 9 in March 2011 have indicated to "a reasonably prudent purchaser" (2386 Creston Ave. Realty, 58 AD3d at 163) that it was necessary to expand the inquiry beyond documents indexed against Lot 9 to locate the records of all conveyances affecting 57 Crosby over the previous 40 years? If this question is answered in the affirmative, the next question is, would the 1981 easement have been revealed by a further "reasonable inquiry, as suggested by the facts" (Anderson, 152 NY at 293) obtained from the initial search? As indicated at the outset of this opinion, we answer both questions in the affirmative.
There is no dispute between the parties as to the records that would have been revealed by a 40-year search on the ACRIS database for documents indexed against Lot 9 in March 2011. Both sides agree that, as indicated by an ACRIS printout in the record, such a search would have yielded the following list of relevant records — in reverse chronological order, and omitting documents (such as mortgage-related instruments) having no bearing on this matter — that were indexed against Lot 9 as of March 2011:
Date ofDate Type of Name of Name of
Document Recorded Document Grantor Grantee
4/26/995/24/99DeedParking Walter
Lot Part- Chatham
nership
4/9/995/21/99Easement Walter 216
Chatham Lafayette
Partners [FN19]
[Not 7/1/71DeedCon Ed Aaron
indicated]Epstein [FN20]
Two things stand out about the foregoing list of documents that were indexed against Lot 9 in March 2011. First, as plaintiff emphasizes, the 1981 easement is absent. But, second (and almost entirely ignored by plaintiff), the search results would have yielded a glaringly apparent break in the chain of title to 57 Crosby between Epstein, who is shown to have acquired the parcel from Con Ed in July 1971, and Parking Lot Partnership, which is shown to have conveyed the parcel to Walter Chatham in May 1999. The results of this search would have given no indication, in March 2011, (1) of the identity of the grantor that conveyed 57 Crosby to Parking [*13]Lot Partnership, (2) of the identity of the grantee to which Epstein conveyed 57 Crosby, (3) of the time at which either conveyance occurred, or (4) of how many conveyances of the parcel were effected between the 1971 and 1999 transactions.
As previously noted, David J. Carroll, the title industry professional whose affidavit plaintiff submitted in opposition to defendant's summary judgment motion, stated that, "[a]ccording to commonly accepted standards of the title search industry, a proper title search should date back for a period of 40 years." It would appear that, under this standard, a prospective purchaser faced with the above-described results of a title search limited to Lot 9 in March 2011 would be compelled to expand the search beyond Lot 9 to complete a chain of title for 57 Crosby that went back 40 years. In his affidavit, Carroll explained the reason that a search limited to Lot 9 in March 2011 would have failed to uncover the 1981 easement. He did not say, however, what steps a prudent title searcher should have taken to attempt to obtain an unbroken 40-year chain of title once the Lot 9 search yielded an unexplained gap between Epstein (who acquired the parcel in 1971) and Parking Lot Partnership (which sold the parcel in 1999) — which, by Carroll's own standard, would have been an unacceptable result. Given the gap in the chain of title that would have appeared from a search limited to Lot 9 in 2011, Carroll's statement that the results of such a search "would not require searching any other parcel from which [Lot 9] may have derived" apparently conflicts with the 40-year standard he endorsed for title searches.[FN21]
Plainly, a reasonably prudent prospective purchaser of 57 Crosby, faced with the incomplete chain of title obtained from a search limited to Lot 9, would next have searched for records indexed to the grantee name "Parking Lot Partnership," the name of the grantor of the parcel in the deed at the end of the gap. That grantee search would have uncovered the 1983 deed from Spacemakers Two to Parking Lot Partnership, an instrument indicating that, in 1983, 57 Crosby was part of Lot 30 [FN22]. A search for records indexed against Lot 30 in March 2011 readily would have revealed both the 1979 deed from the Epsteins to Spacemakers Two (thereby [*14]completing the chain of title) and the 1981 easement. Accordingly, plaintiff "is chargeable, as a matter of law, with notice of [the 1981 easement as one] of the facts which a proper inquiry would have disclosed" (Fairmont Funding, 301 AD2d at 564). As one court put it more than a century ago:
"[Plaintiff] neglected to follow up the inquiry suggested by a palpable break in the chain of title, which, had it been followed up with reasonable diligence, would have led to a knowledge of [defendant's] rights in the premises. As [plaintiff] might have ascertained such facts by reasonable prudence and diligence, [it is] chargeable with notice of such facts" (Lyon v Gombert, 63 Neb 630, 634, 88 NW 774, 775 [1902]).
While plaintiff says virtually nothing about the apparent gap in the chain of title to 57 Crosby that emerged from its limited search (and that should have prompted an extension of the search), it focuses its argument on the contention that the 1981 easement was "erroneously indexed." Plaintiff, casting itself as the "innocent" party in this matter, contends that the risk of such an indexing error should be borne by defendant, as owner of the dominant parcel and successor in interest of the presumed proponent of the 1981 easement. For several reasons, this line of argument is unavailing.
Initially, we are not persuaded by plaintiff's view that an error was made in the indexing of the 1981 easement. At the time the 1981 easement was created and recorded, it was properly indexed against Lot 30, which then included both the servient parcel (57 Crosby) and the dominant parcel (214 Lafayette)[FN23]. However, plaintiff asserts (and it persuaded Supreme Court on this particular point) that, when Lot 30 was subdivided in 1984, the 1981 easement should have been re-indexed against the new Lot 9, the revived designation for 57 Crosby. But plaintiff does not identify any statute, regulation or rule that would require that a previously recorded instrument be re-indexed either upon the subdivision of a lot into two or more smaller lots (as was effected with respect to Lot 30 in 1984) or upon the merger of two or more lots into one lot (as was effected with respect to Lot 9 and Lot 30 at some point in the 1970s)[FN24]. In fact, neither of the title industry professionals who submitted affidavits in this case (Carroll for plaintiff, Beck for defendant) opined that the 1981 easement should have been reindexed upon the subdivision of Lot 30 in 1984. Carroll's description of how a title search of a lot subdivided from a "parent" [*15]lot should proceed plainly assumes that instruments recorded before the subdivision of the "parent" lot are not reindexed against the new lot designations upon the effectuation of the subdivision.[FN25]
In any event, we need not decide whether an error was made in the indexing of the easement because, under the facts of this case, whether plaintiff is entitled to avoid the 1981 easement as a bona fide purchaser does not depend on whether some error was made in the indexing of the declaration that created the easement [FN26]. Rather, whether plaintiff is so entitled depends on whether, under all of the circumstances, it had constructive notice of the 1981 easement when it purchased the servient estate in 2011. We have already concluded that plaintiff had such notice — that the gap in the chain of title apparent from a search of Lot 9 alone would have led a prudent prospective purchaser of 57 Crosby to inquire further and discover the parcel's previous designation as part of Lot 30, which would have led directly to the further discovery of the 1981 easement that was then indexed against Lot 30 [FN27]. It follows, therefore, that plaintiff cannot avoid the easement as a bona fide purchaser, whether or not some error was made in the indexing of the declaration creating that encumbrance or (as appears more likely) in the indexing of the subsequent instrument subdividing 57 Crosby from Lot 30 and redesignating it as Lot 9 (see Astoria Fed. Sav. & Loan, 190 AD2d at 645-646 [although the plaintiff's mortgage had been "indexed under an erroneous lot number," because "the existence of the mortgage lien was clearly recited in the deed conveying the encumbered property to the (subsequent purchasers') predecessor-in-interest," the subsequent purchasers "had constructive notice of the plaintiff's mortgage"]).
We find unavailing plaintiff's reliance on a line of cases containing statements to the [*16]effect that, in light of Real Property Law § 316 (providing that indexes "form a part of the record of each instrument hereafter recorded"), "[a]n error in indexing prevents the record from constituting constructive notice of the filed instrument for the period that the error remains uncorrected" (Baccari, 70 AD2d at 202; see also Del Pozo v Impressive Homes, Inc., 95 AD3d 1267, 1268 [2d Dept 2012] [same]; but see Real Property Law § 317 [providing that an instrument delivered to a recording officer for recording "is considered recorded from the time of such delivery"]; 2 Milton R. Friedman & James Charles Smith, Contracts & Conveyances of Real Property § 29:5.7, at 29-28——29-29 [8th ed 2019] [discussing Baccari and its treatment in subsequent decisions]). As previously explained, in this case, there was no error in the indexing of the 1981 easement. But even if there were such an error, under the undisputed facts of this case, the error would not have negated constructive notice because, as previously explained, it would not have prevented a reasonably prudent and diligent prospective purchaser from discovering the easement through the use of ordinary care and diligence. We do not believe that the intended meaning of the above-quoted passage from Baccari was that any error in indexing a recorded instrument negates constructive notice, even if the error would not have prevented a reasonably prudent and diligent purchaser from locating the instrument (cf. Del Pozo, 95 AD3d at 1267-1268 [in holding that Citibank did not have constructive notice of a notice of pendency that had not been indexed at the time Citibank encumbered the property, the court noted that, "[s]ince the notice of pendency was not indexed against the property, Citibank could not, in the exercise of due diligence, have discovered the plaintiff's claim"]).[FN28]
Finally, in view of the foregoing, we need not determine whether plaintiff had constructive notice of the 1981 easement from the contents of the declaration of the 1999 easement.
Accordingly, the order of the Supreme Court, New York County (Kathryn Freed, J.), entered March 14, 2018, which granted defendant's motion for summary judgment dismissing the complaint, should be modified, on the law, to declare in defendant's favor on the first cause of action that plaintiff purchased 57 Crosby
with constructive notice of the 1981 easement, and otherwise affirmed, without costs. The Clerk is directed to enter judgment accordingly.
M-1060 Akasa Holdings, LLC v 214 Lafayette House LLC
Motion to strike denied as academic.
All concur.
Order, Supreme Court, New York County (Kathryn Freed, J.), entered March 14, 2018, modified, on the law, and otherwise affirmed, without costs.
Opinion by Friedman, J.P. All concur.
Friedman, J.P., Renwick, Kapnick, Kahn, Oing, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: SEPTEMBER 3, 2019
CLERK



Footnotes

Footnote 1:In New York City, a conveyance of an interest in real property, when recorded in the Office of the City Register, is indexed against the numerical block and lot designations of the affected parcels on the Tax Map maintained by the Department of Finance (see Administrative Code of City of NY § 7-625). The Court of Appeals has noted that the tract-based block-and-lot method of indexing recorded conveyances is intended to allow "the title searcher readily to find all conveyances within a given time frame which affect a particular parcel of land" without using "the more tedious and cumbersome method of tracing a chain of title through successive grantors and assignors" (Andy Assoc. v Banker's Trust Co., 49 NY2d 13, 24 [1979]; see also John G. Sprankling, Understanding Property Law at 426-431 [4th ed 2017] [comparing title searching using a grantor-grantee index with title searching using a tract index]; Bernard M. Rifkin & S.H. Spencer Compton, "Search and Examination of Title," §§ 2.1-2.3, in 1 James M. Pedowitz (ed.), Real Estate Titles [3d ed 2007] [same]; Whitman § 11.11, at 786-788 [same]; 9 Warren's Weed, New York Real Property [hereinafter, Warren's Weed] § 95.32[2] [5th ed 2019] [same]).

Footnote 2:While the record does not disclose precisely when Lot 9 was merged into Lot 30, the record does include printouts from New York City's online title registration database (the Automated City Register Information System [ACRIS]) indicating that no recorded documents were indexed against Lot 9 between February 2, 1972 (the date of the recording of a release) and May 21, 1999 (the date of the recording of the deed to plaintiff's immediate predecessor-in-interest). After plaintiff purchased 57 Crosby, documents pertaining to 57 Crosby that were recorded while the parcel was part of Lot 30 have been reindexed against Lot 9, but such reindexing has no bearing on this appeal.

Footnote 3:Although, as previously noted, 57 Crosby is a vacant lot, the other three parcels have been occupied by buildings at all relevant times.

Footnote 4:Because the block on which all relevant parcels are situated has been designated as Block 482 at all relevant times, the remainder of this opinion will generally omit references to the block number.

Footnote 5:Although not mentioned in the declaration of easement or shown on the diagram attached to the declaration, the record shows that a metal ladder descends from the southwest corner of the roof of the two-story building at 216 Lafayette to the southeast corner of the vacant lot at 57 Crosby.

Footnote 6:It is undisputed that the building that occupied 214 Lafayette in 1981 remains standing today.

Footnote 7:By contrast, the 1981 easement — the easement that is the subject of this action — granted 214 Lafayette (directly to the south of 216 Lafayette, and diagonally to the rear of 57 Crosby) a right of ingress and egress by foot over a six-foot-wide strip of land alongside 57 Crosby's southern border.

Footnote 8:Since defendant's title to 214 Lafayette is not in dispute (apart from the dispute over the validity of the 1981 easement), we omit a recitation of the chain of title to 214 Lafayette from Artsbar (the grantee of the 1981 easement) to defendant.

Footnote 9:On this appeal from the dismissal of the complaint, plaintiff has not made any argument concerning its causes of action for trespass and unjust enrichment. Those claims are therefore deemed to have been abandoned.

Footnote 10:The declaration of the 1999 easement includes a schematic diagram with a reference to a six-foot-wide "EASEMENT" for "EMERGENCY EGRESS ONLY" on the southern edge of the roof of the building at 216 Lafayette, alongside the building at 214 Lafayette. In the motion court, defendant took the position (which it maintains on this appeal) that the reference in the 1999 easement to a preexisting easement over 216 Lafayette's roof, running alongside 214 Lafayette, combined with the known presence of the metal ladder at the southwest corner of 216 Lafayette, should have alerted plaintiff to the likelihood that 214 Lafayette had an easement for emergency egress to the street over the vacant lot at 57 Crosby. Defendant also argued to the motion court that 214 Lafayette was an intended beneficiary of the 1999 easement, but that argument has been omitted from defendant's appellate brief.

Footnote 11:In fact, as previously noted, it appears from the record that the Lot 9 designation continued to be used for 57 Crosby until 1972. However, it is not material to the outcome of this appeal whether 57 Crosby was merged into Lot 30 in 1971, in 1972, or at some later time before the 1979 post-merger conveyance of Lot 30. The important point, which is undisputed, is that the merger occurred at some point (1) after the 1971 conveyance of 57 Crosby, as a stand-alone Lot 9, from Con Ed to the Epsteins and (2) before the 1979 conveyance of 57 Crosby, as part of the enlarged Lot 30, from the Epsteins to Spacemakers Two.

Footnote 12:Based on the results of an online search of the database of the New York State Department of Finance, Beck asserted that, unlike Ridge Abstract and himself, "neither [the aforementioned] David J. Carroll nor S.J. Carroll Jr. [Carroll's firm] has ever been licensed as a Title Insurance Agent in New York State." We find it unnecessary to determine whether Carroll is qualified to offer an expert opinion in this matter, since it appears, as more fully discussed below, that Carroll and Beck substantially agree on the results that would have been yielded by a 40-year title search in 2011 (the year plaintiff purchased 57 Crosby) that was limited to records indexed against Block 482, Lot 9. Whether the results of such a search would have indicated to a reasonably prudent person that further inquiry was required is, on this record, a pure question of law.

Footnote 13:The 1983 deed from Spacemakers Two to Parking Lot Partnership identifies the parcel being conveyed as 57 Crosby and contains a reference to "Block 482, P/O 30" — meaning that the parcel was part of Lot 30 at the time of the 1983 conveyance.

Footnote 14:Beck also endorsed defendant's argument that information contained in an attachment to the declaration of the 1999 easement (of which plaintiff was aware when it purchased 57 Crosby) provided constructive notice of the 1981 easement.

Footnote 15:We note that, in this action, plaintiff has not raised any argument that the 1981 easement, even if it otherwise would be valid, has been extinguished by adverse possession by reason of the physical structures that have been built in its path, alongside the 55 Crosby building, as previously discussed. We are advised that such an adverse possession claim has been raised in a different action between the same parties that was commenced after the order appealed from was rendered (214 Lafayette House LLC v Akasa Holdings, LLC, Sup Ct, NY County, Index No. 153415/2018 [the 2018 action]). This decision expresses no opinion on the merits of the adverse possession claim asserted in the 2018 action or on whether the determination of this action in defendant's favor has any effect on plaintiff's ability to assert the adverse possession claim in the 2018 action or in any other proceeding.

Footnote 16:We note that defendant has made no claim that, as owner of 214 Lafayette, it is entitled to an easement over 55 Crosby by necessity, implication, or prescription.

Footnote 17:The Court of Appeals explained its holding in Andy Associates as follows: "This [block and lot] indexing method . . . enables the title searcher readily to find all conveyances within a given time frame which affect a particular parcel. . . . Thus, it appears that where the block and lot' indexing method is used, there is no logical reason to afford potential purchasers additional protection by applying the time-honored rule that a purchaser is not chargeable with constructive notice of conveyances recorded outside of his direct chain of title. That rule, which was developed in cases where the purchaser had to rely upon the grantor-grantee system of indexing, simply represented a pragmatic judicial response to the exigencies of conducting a title search under such a system. Its application in a case such as this, where the block and lot' indexing system was available would seem, at the very least, a somewhat anachronistic result" (49 NY2d at 23-24 [citations omitted]).

Footnote 18:The 1981 easement is not recorded in plaintiff's direct chain of title because the easement is not referenced in the deed conveying 57 Crosby to plaintiff or in either of the two deeds conveying the parcel to plaintiff's direct predecessors in title (in reverse chronological order, Walter Chatham [1999] and Parking Lot Partnership [1983]) who acquired the lot since the easement was created (see Witter, 78 NY2d at 238 [in a case concerning land in a county using a grantor-grantee indexing system, reaffirming the rule that "an owner of land is only bound by restrictions if they appear in some deed of record in the conveyance to that owner or that owner's direct predecessors in title"] [emphasis added, internal quotation marks and brackets omitted]). An encumbrance is not deemed to be in a purchaser's direct chain of title merely because it is "included in a deed to another lot conveyed by the same grantor" (id. at 239). Stated otherwise, "[A] deed conveyed by a common grantor to a dominant landowner does not form part of the chain of title to the servient land retained by the common grantor" (id.).

Footnote 19:This document is the declaration of the 1999 easement (benefitting 216 Lafayette), which Chatham apparently signed as grantor before 57 Crosby (the servient parcel) had been conveyed to him by Parking Lot Partnership. Since the validity of the 1999 easement is not at issue in this action, this discrepancy is not of concern here.

Footnote 20:Rosalyn Epstein's name does not appear in the printout.

Footnote 21:The apparent gap in the chain of title also belies the statement in plaintiff's appellate brief that "even a professional title searcher would have had no indication [from the results of a search limited to Lot 9] that there was a hole in the record." An almost 30-year break in the chain of title (from 1971 to 1999) is "a hole in the record" about as gaping as can be imagined.

Footnote 22:There is no dispute between the parties on this point. Carroll admitted that title searchers are able to determine lot numbers previously assigned to a parcel and to extend the search to the former lot number when necessary to complete a 40-year search. He wrote that, where a lot has been subdivided within the last 40 years, "a search by an examiner of a newly designated lot would (based on industry standards of 40 years) necessarily involve a search of the parcel from which that newly designated lot derived. . . . In that case, the examiner would be required if following industry standards to search back more years [after going back to the year of the subdivision] and thus would turn up the parent' lot . . . and any encumbrances against that lot within 40 years."

Footnote 23:We are not persuaded by plaintiff's assertion that the notation "LOT P/O 30" (part of Lot 30) on the last page of the declaration of the 1981 easement constituted an error in the easement's recording or indexing. It is not disputed that, at all relevant times, a title search of Lot 30 would have turned up the 1981 easement. While plaintiff correctly notes that the failure to index the 1981 easement against Lot 28 (216 Lafayette) was an error, this was not an error that in any way prejudiced plaintiff as a purchaser of 57 Crosby, which was a part of Lot 30 when the easement was created.

Footnote 24:The City Register's remark, upon defendant's rerecording of the 1981 easement against Lots 9 and 28 in 2014, that those lots "were inadvertently omitted at the time of recording," appears to be a misstatement with respect to Lot 9. When the 1981 easement was originally recorded, Lot 9 did not exist.

Footnote 25:Specifically, Carroll wrote: "[I]f for example, a subdivision of a lot designated as Lot 1 occurs in 2010, and produces new lots designated as Lots 2 and 3, a search of Lot 3 in 2017 would only reveal an existence of 7 years. In that case, the examiner would be required if following industry standards to search back more years and thus would turn up the parent' lot (i.e., Lot 1) and any encumbrances against that lot within 40 years."

Footnote 26:The parties appear to agree that it was poor practice to reuse the Lot 9 designation for 57 Crosby upon the subdivision of Lot 30 in 1984, although they have not identified any formal rule that was violated in so doing. We note that the reuse of the Lot 9 designation was proposed to the City Register by the three landowners (Parking Lot Partnership, Artsbar, and 55 Associates) that applied for the subdivision. The failure to index the documentation of the subdivision against the new Lots 8 and 9, which were plainly affected by the subdivision, appears to have been an error.

Footnote 27:While a purchaser is "not required to search in strange and unusual places to discover recorded instruments showing hostile title" (Mackenzie v Augimeri, 210 App Div 156, 158 [4th Dept 1924]; see also 11 Warren's Weed § 115.65), plaintiff plainly could have discovered the 1981 easement in 2011 without undertaking any such "blind[]" search (id. § 115.69).

Footnote 28:While, as noted by Supreme Court and discussed by the parties, Baccari draws a distinction between errors of misfeasance and errors of nonfeasance in the indexing of recorded instruments (see 70 AD2d at 202-204), that distinction is of no moment here because any indexing error in this case — whether of misfeasance or of nonfeasance — would not have prevented a prudent purchaser from discovering the 1981 easement, for the reasons already discussed.